# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN THE MATTER OF THE,                )
EXTRADITION OF                       )          No. 17 CR 664
RODOLFO DEIBY BURGOS                 )
NOELLER,                             )          Magistrate Judge Jeffrey Cole
                                     )

## MEMORANDUM OPINION AND ORDER

## INTRODUCTION

The Federal District Court in Mexico City issued a warrant for the defendant's arrest on June 18, 2015. On October 10, 2017, the United States filed a Complaint against the defendant for Provisional Arrest in Furtherance of Extradition pursuant to 18 U.S.C 3184. The Complaint alleged that there was an extradition treaty in force between the United States and Mexico, Article 11 of which provides for the provisional arrest and detention of alleged fugitives, pending the submission of a formal request for extradition and supporting documents.[1] The Complaint alleged that in accordance with Article 11 of the Treaty, Mexico has asked the United States for the provisional arrest of Mr. Burgos Noeller for having murdered in Mexico, Rosa Elena Jacobo Carrillo, the woman with whom he had two children.

The Complaint charged that the killing had been preceded by domestic violence between the two and that the defendant had previously threatened to kill Rosa. Two family members have sworn they saw him grab Rosa by the hair and begin to choke her. He then, they said, shot her with his pistol twice in the head and fled. The two named family members, who knew Burgos Noeller from his relationship with Rosa, identified him as the killer from a photograph. There is sworn testimony accompanying the Complaint that the murdered woman's family who saw the killing would be

---

[1] That request has been made according to the recent submission of the government. [Dkt. #27].

witnesses at a trial. Their truthfulness or accuracy is for a jury in Mexico, not for this court. *Sahagian v. United States*, 864 F.2d 509, 514 (7ᵗʰ Cir. 1988). On October 12, 2017, the defendant was transferred from ICE custody to the custody of the U.S. Marshals, and he is presently housed at the Metropolitan Correctional Center in Chicago.

Despite the horrific nature of the charged crime and the existence of substantial evidence against him, the defendant seeks release on bond. [Dkt. #22]. While he concedes that release on bond pending an extradition hearing is "disfavored" [Dkt. #22 at 2], and that the Bail Reform Act does not apply in extradition proceedings, he contends that bail may nonetheless be granted upon the showing of "special circumstances." His initial argument that he has shown that he is neither a flight risk, nor a danger to the community is based on the fact that his father-in-law and brother-in-law have stated in Declarations that he is, in reality, an honorable man, whom his family and friends love, and who has positively impacted the lives of others. Declarations from the defendant's wife and children have also been attached to the defendant's Motion for Bond. In essence, they attest to the importance of the defendant in their lives.

Perhaps recognizing that, even if true, these encomia are insufficient in themselves for a court to allow the defendant to be released on bond, the defendant contends that "special circumstances"exist requiring bond. The argument is that he suffers from epileptic seizures, which the MCC has not, will not and cannot properly treat. To that is added the contention that the defendant fears for his safety and indeed his very life if he is returned to Mexico. As we shall see, the defendant has not proven the facts underlying these claims. And, "unfortunately... saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). "Lawyers' talk is no substitute for data." *Phillips v. Allen,* 668 F.3d 912, 916 (7ᵗʰ Cir.

2012). We begin with the legal framework of extradition proceedings.

# I.

## THE FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.

The extradition process is *sui generis*. *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011). Extradition is primarily an executive function, with the court playing a defined and limited role. Authorized by statute, the court is to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184. The Secretary of State, and not the court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. If the court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition

judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"). *See also Eain*, 641 F.2d at 508.

In fulfilling its function under § 3184, the court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933). *See also, Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016)(*en banc*)("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfilling our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), a court should "approach challenges to extradition with a view toward finding the offenses within the treaty." *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981). *See also United States v. Nolan*, 2009 WL 4544699 at 2-3 (N.D.Ill. 2009)("'...the rational [sic] for not ordinarily granting bail in extradition cases is that extradition cases involve an overriding national interest in complying with treaty obligations.'").

## B.

### The Rule of Non-Inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the court. 18 U.S.C. §§ 3184 & 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005)(extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of

requesting state is a matter for consideration by the executive branch); *Quinn v. Robinson*, 783 F.2d 776, 789 (9th Cir. 1986) ("the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive"). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *In re Kaine*, 55 U.S. 103, 110 (1852).

## II.

## THE SPECIAL CIRCUMSTANCES DOCTRINE

### A.

Since *Wright v. Henkel*, 190 U.S. 40, 63 (1903), it has been settled that "while bail should not ordinarily be granted in cases of foreign extradition," courts are not powerless to grant bail if the defendant can show there are "special circumstances." That deceptively simple phrase was not defined or discussed by the Court, although it seems obvious that the circumstances cannot be those which affect extradition defendants generally, but rather must be, as the Court required, "special." As so often occurs, the Court left it for succeeding cases to reify an elusive and nebulous concept that defied easy definition. Although extradition laws have been updated and procedures re-codified since 1903, bail has not been statutorily provided for in extradition cases.

Thus the concept of "special circumstances" began as and continues to be an undefined (but not unexplored) judicial creation. To say that "[s]pecial circumstances are limited to situations in

which the justification [for release] is pressing as well as plain" may not *define* "special circumstances, but it tellingly conveys how infrequently bail has been granted in extradition cases and how onerous a defendant's burden is in such cases. *See United States v. DeLoera*, 2006 WL 1518981 at 3 (N.D.Ind. 2006). Only a review of the variegated facts of a lengthy series of cases can help to determine what constitutes "special circumstances." What is clear is that there is a long-standing presumption against bond in extradition proceedings, and that absent a showing by the defendant that there are "special circumstances" associated with the case, bail will be denied. *Gullers v. Bejarano*, 2009 WL 250053 (S. D. Cal. 2009).

As an initial matter, a fugitive charged with crimes in another country is by definition in flight or deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution in his home country is indicative of his risk of flight were he to be released on bond here. In the context of determining whether a defendant poses a substantial risk of flight, there is no meaningful distinction between a person who left a country when he learned of pending charges and one who already outside that country refuses to return to face these charges. The intent is the same—the avoidance of prosecution. *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976); *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985). Thus, one who has left a country charging him with murder of the mother of his children, is a likely flight risk in the country to which he has fled after the charged crime.

The traditional rationale for the presumption is that the individual, if released, could abscond, leading to serious embarrassment to the United States and a potential that reciprocating foreign countries would not honor this country's extradition requests. *See In re Extradition of Orozco*, 268

F.Supp.2d 1115, 1117 (D. Ariz. 2003).[2]

To satisfy the "special circumstances" rule, the circumstances must be extraordinary and not merely applicable to all defendants facing extradition. *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992); *Gullers*, 2009 WL 250053; *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996). Courts have considered and rejected a lengthy list of claimed special circumstances, including: the fugitive's character, background, and/or ties to the community, *see, e.g., Beresford-Redman*, 753 F. Supp. 2d at 1089; *Matter of Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994), the fact that the fugitive may have been living openly, *see, e.g., Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. 2009), discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated. *See, e.g., In re the Extradition of Kyung Joon Kim*, 2004 WL 5782517, at *5 (C.D. Cal. 2004).

Similarly, the fact that a particular treatment available in some places is not available to the

---

[2] Courts determine whether special circumstances exist on a case-by-case basis. *In Matter of Extradition of Ramos*, 2015 WL 4748821, at *5 (D. Colo. 2015). This insistence on assessment of the facts in each extradition case is perfectly consistent with the recognition in other areas that "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Upjohn Company v. United States,* 449 U.S. 383, 390 (1981). *Accord Sandra T.E. v. South Berwyn School Dist.* 100, 600 F.3d 612, 619 (7th Cir.2010). *Compare*, *Graham v. Connor,* 490 U.S. 386, 396 (1989);*Kingsley v. Hendrickson, _U.S._,* 135 S.Ct. 2466, 2473 (2015). Holmes said it best: "general propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting). *See also Daubert v. Merrell Dow*, 509 U.S. 579, 598 (1993)(Rehnquist, C.J., concurring in part and dissenting in part)("'general observations'" suffer from the common flaw that they are not applied to the specific matter and "therefore they tend to be not only general, but vague and abstract.").

Thus, one ought not expect unanimity in the extradition/bail opinions – anymore than in any fact-driven area of the law. But the criticism that "courts have *stumbled* along in applying this 'special circumstances' test" is exaggerated, as is the criticism that the special circumstances doctrine "has resulted in a *judicial mess*." Joshua J. Fougere, *Let's Try This Again: Reassessing the Right to Bail in Cases of International Extradition*, 42 Colum. J.L. & Soc. Probs. 177, 187–88 (2008) (emphasis supplied).

defendant during his detention does not create a "special circumstance" exempting him from detention. The mere availability of a better, private form of medical treatment is not sufficient to overcome the presumption against bail. The claimed medical condition must, of course, be proven and not merely alleged to exist. Most cases, in fact, are supported by doctor's affidavit or its equivalent, and or the defendant must provide sufficient detail regarding his condition or his medical treatment needs to convince the court that the severity of his condition is a "special circumstance," warranting release on bond. If the materials provided by the defendant do not sufficiently explain to the court that a defendant's condition is either life threatening or so serious and exigent that his medical needs cannot be accommodated by the United States Marshal service while in custody, a defendant will have failed in his obligation to prove his entitlement to bond. *Nezirovic v. Holt*, 990 F.Supp.2d 594, 601-03 (W.D.Va. 2013); *In re Extradition of Garcia*, 761 F.Supp.2d 468, 481 (S.D.Tex. 2010). That is precisely what has occurred here.

The support for the claim of epilepsy is found in Exhibit A to the defendant's Motion for Release on Bond. [Dkt. #13]. The materials in that exhibit demonstrate neither a pressing nor a plain health condition that cannot be managed by the MCC. *See United State v. Nolan*, 2009 WL 4544699 at *2 (N.D.Ill. 2009). It is not enough that a particular treatment is not available in one place but it is in another. *Id.*

## B.

Of course, the defendant argues he is not a flight risk, and that he would not "logically" abscond to Mexico. [Motion for Release on Bond, Dkt. #13 at 6]. Apart from the error in and the speculative quality of the prognostication, the requirement that there be "special circumstances" is not satisfied by a showing of things that are not special. *See DeLoera*, 2006 WL 1518981 at *3

("case law provides that certain circumstances by themselves do not constitute special circumstances including: absence of risk of flight... or certain health concerns."). For example, the need to consult with counsel, gather evidence and confer with potential witnesses although important is common to all defendants and is thus not extraordinary or special within the meaning of the "special circumstances" requirement. *Matter of Extradition v. Smyth*, 976 F.2d 1535 (9ᵗʰ Cir. 1992). Similarly, a showing that one is *not* a flight risk or danger to the community does not satisfy, either linguistically or under the case law, the requirement that there be a showing of "*special* circumstances." *See DeLoera*, 2006 WL 1518981 at 3. Rather the absence of a defendant's risk of flight is more in the nature of a condition precedent to going forward with a determination of the existence of special circumstances that "'could overcome the presumption against bail.'" *Garcia v. Benov*, 2009 WL 6498194 at *3 (C.D.Cal. 2009). *See also, United States v. LuiKin Hong*, *3 F.2d 523 (1ˢᵗ Cir. 1996); *Sahagian*, 864 F.2d at 513, n 6. In other words, that the detainee is not a flight risk is not a special circumstance warranting release. *Garcia*, 2009 WL 6498194 at *3. The same is true of a showing that a defendant is not a danger to the community. *Id. Accord Salerno v. United States*, 878 F.2d 317, 318 (9ᵗʰ Cir. 1989); *Matter of Extradition of Russell*, 805 F.2d 1215, 1217 (5ᵗʰ Cir. 1986); *United States v. Smyth*, 795 F.Supp. 973, 976 (N.D.Cal. 1992).

Thus, the several affidavits submitted by Burgos Noeller with his motion for bond, even assuming them to be not merely the predictable response and assessment of friends and family, do not decide the issue of the propriety of the granting of bond in this case. In *In re Extradition of Beres Ford-Redman*, 753 F.Supp.2d 1078 (C.D.Cal. 2010), as here, the defendant submitted multiple letters from friends, family, and business associates in support of his contention that his character, integrity, and commitment to his family are a special circumstance that favored bail. The court found

that while this evidence may be relevant to the assessment of flight risk and danger to others – although, the court held, they were not dispositive on either issue – the *totality* of the evidence proffered did not qualify as a "special circumstance" in favor of bail.

More importantly, the court held that "[m]ore often, the character and background of a person subject to extradition are considered in regard to risk of flight and danger to the community rather than as a special circumstance." *Nacif–Borge,* 829 F.Supp. at 1220. *See also Matter of Extradition of Sutton,* 898 F.Supp. 691 (E.D.Mo.1995)("an extradition fugitive's character and background ... are not by themselves a special circumstance."). To the extent the letters of support made some showing that the defendant was trustworthy, the court nevertheless found that they did not suffice to find that they established a "special circumstance."  Instead, they were only relevant to the question of whether or not the defendant will flee and thus were an insufficient basis for the court to find that defendant had satisfied the requirement that he show that "special circumstances" mandated or justified bail. *In re Extradition of Beresford-Redman*, 753 F.Supp.2d at 1089.[3]

Moreover, the court found that the letters, when considered in light of the specific and detailed allegations of the Complaint, at best created a seriously disputed issue regarding the defendant's character and do not prove good character or trustworthiness by a preponderance of the evidence. The Complaint alleged that Beresford–Redman was engaged in a lengthy extra-marital affair and that the existence of the affair was confirmed both in email evidence and witness

---

[3] The court noted that the letters, when considered in light of the specific and detailed allegations of the Complaint at best created a seriously disputed issue regarding the defendant's character. The alleged extramarital affair, which was confirmed both in email evidence and in witness statements, could not, the court reasoned, square with or the claim of integrity or devotion to family. 753 F.Supp.2d at 1089. Similarly, the alleged conduct in this case would seem quite inconsistent with the claim of integrity and devotion to family and friends that are sought to be advanced by the Affidavits submitted by the defendant.

statements. None of the letters of support in the instant case acknowledge the claimed affair or explain how such alleged conduct is consistent with a man of "integrity" or one who is "devoted" to his family. *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d at 1089.

Then there is the terse contention that it would be "illogical" for the instant defendant to flee to Mexico. *See also* Reply in Support of Motion for Release on Bond at 8 [Dkt. #20 at 7].[4] One is reminded of Justice Holmes' classic opening to the Common Law that "the life of the law has not been logic, but experience." It is indisputable that Mexico is an enormous country, occupying approximately 758,000 sq. miles and having a population of approximately 127,000,000 people. One who is a native of Mexico and speaks the language fluently – indeed the defendant apparently does not speak English at all and requires an interpreter – might well flee to Mexico (other than the city or area of the killing) and hide himself in the hustle and bustle of what is a massive, complex society, with millions of inhabitants. To insist that a person without a Mexican passport could not and would not flee to Mexico is fatuous. The defendant's terse conclusion is as illogical as saying that one who is arrested in Chicago for a crime in Cleveland is not a flight risk because he would "logically" not flee to Cleveland. *Cf. In re Johnson*, 2012 WL 3929811 at *5 (W.D.Pa. 2012)(defendant accused of murdering and raping 16 year old boy in Mexico and then fleeing was properly deemed a flight

---

[4] The Reply alleges that the pretrial services report does not document any prior violent offense or behavior. [Dkt. #20]. That obviously does not decide the question before the court. That is apparently the source for the claim that the defendant "stated he suffers from epileptic seizures, deformity in the brain and daily headaches." The report indicated that the defendant underwent surgery in December 2014 and is pending further medical treatment. No claim was made of a present dire medical condition.

It should be noted, that the pretrial services report of October 30, 2017 was available a week before the defendant filed the motion for release on bond. if the defendant sought to rely on it, it could and should have been referred to in the defendant's motion for release on bond filed on November 6, 2017. [Dkt. #13].

risk).[5]

Even if one would not "logically" "abscond to Mexico," flight within the United States would not pose insuperable problems and is quite logical, as is borne out by a host of cases involving flight. The enormity of the country and the places within it where Spanish is spoken are numerous and well known. If the defendant's argument were accepted, virtually no foreign national charged with a crime in their home country would be a flight risk, since he would not flee to the scene of the crime in a foreign country. Common sense and human experience—which always have a role to play in any case, *United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992)(Breyer, C.J.); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir.2009); Posner, How Judges Think at 116 (Harv. Univ. Press 2008), require that the defendant's argument be rejected.

The defendant also claims that he would be tortured or murdered "with the acquiescence of a public official" if he were returned to Mexico. [Dkt. #13 at 6]. "[U]nfortunately... saying so doesn't make it so," *5443 Suffield Terrace,* 607 F.3d at 510, and "[l]awyers' talk is no substitute for data." *Phillips,* 668 F.3d at 916. "[H]ypothesis is not proof . . . ." *Lauth v. McCollum,* 424 F.3d 631, 634

---

[5] The defendant's lawyer states: "*[a]side from Mexico* the defendant does not have the support network or the financial means to survive anywhere in the world but the United States, more specifically the Chicagoland area." [Dkt. #13 at 6](Emphasis supplied). Of course, the representations by the defendant's lawyer are improper and unsupported. We leave aside the implicit admission that the defendant does have the support network and financial means to survive in Mexico; but it is basic that unsupported statements in briefs are not evidence and do not count. *See e.g., Woolard v. Woolard,* 547 F.3d 755, 760 (7th Cir.2008); *United States v. Stevens,* 500 F.3d 625, 628–29 (7th Cir.2007); *Campania Mgmt. Co. v. Rooks, Pitts & Poust,* 290 F.3d 843, 853 (7th Cir.2002); *Ho v. Donovan,* 569 F.3d 677, 682 (7th Cir.2009); *United States ex rel. Feingold v. AdminaStar Federal, Inc.,* 324 F.3d 492, 494, 497 (7th Cir. 2003); *Car Carriers Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984). The same is true of statements at oral argument. *In re: Payne*, 431 F.3d 1055, 1060 (7th Cir. 2005) (Posner, J.); *Ho v. Donovan,* 569 F.3d 677, 682 (7th Cir. 2009)("Assertions in an appellate brief are no substitute for evidence.").

(7th Cir. 2005).[6]

The proof in this case of the defendant's fear of murder or torture "with the acquiescence of a public official" if not non-existent, it is at the very least, non-persuasive. It is claimed to inhere in the statements in the affidavit of the defendant's father-in-law, in which he relates events that he considers to be an imminent threat against his life and that of the defendant. The affidavit states that in July of 2017 he was told by his neighbor that three men came to his apartment in Mexico, armed with weapons and looking for the defendant. Not finding the defendant, the "gangsters" – the phrasing is the declarant's – shot up the vehicle and shouted that the shots were meant as a warning of what would happen to whomever "hid" the defendant. The individual who related the incident to the father-in-law/affiant "believes" the organized crime group, "Los Pepes," did the shooting and "he [the Declarant] believes the Pepes would have killed [the affiant]." Nothing in the Affidavit links Los Pepes to the Mexican government.

On June 20, 2016, the defendant's cousin made a complaint to the police in Mexico in which he swore that as he was leaving his house he saw four subjects whom he had previously seen and were known to him to be members of a "criminal gang called los pepes" that was "looking for" the defendant. [Dkt. #13, Ex. D, 071]. When he told them he did not know the whereabouts of his cousin and his family, "they started beating us until I was left unconscious...." The claimed "brutal...beating" allegedly caused serious, life threatening injuries and allegedly resulted in the hospitalization of the affiant.

---

[6] *See Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 888 (N.D. Ill. 2014)(collecting numerous Seventh Circuit cases rejecting lawyer's unsupported claims and requiring proof before a proposition can be accepted by the court). *See also Morgan v. South Bend Community School Corp.*, 797 F.2d 471, 480 (7th Cir.1986).

Finally, there is the affidavit of the defendant's wife in support of her "husband's claim that he will be murdered if removed to Mexico." [Dkt. #13, Ex. D, 076]. The affidavit states that her minor son called his great aunt in Mexico and was told that [she] would prefer to speak to the affiant. In the conversation that followed, the aunt, it is claimed, told the affiant that her son, the defendant's cousin, had been "severely beaten by Los Pepes and left for dead." The gang had asked for the defendant. Upon hearing this, the defendant was "very concerned." This incident, the defendant's wife says, "further supports our concerns that if removed to Mexico, my husband will be tortured and murdered by Los Pepes." [Dkt. #13, Ex. D., 077]. No mention was made of the Mexican government or any relationship between Los Pepes and the government.

How these claims support the argument that the defendant will be tortured or murdered with the acquiescence of a Mexican public official is not explained, and nothing shows that a public official would be acquiescent in the torture or murder of the defendant were he returned to Mexico to stand trial. The affidavit recognizes that Los Pepes is not a part of the government of Mexico, and so far as one can tell from the internet, it was a "vigilante group" that rebelled against Pablo Escobar in the early 1990s. The affidavits characterize Los Pepes as a private gang seeking to kill the defendant – presumably because of his killing of Rosa, although the affidavits try to make it appear that their thirst for revenge is unrelated to any murder, and do not even guess or hint at a motivation that would have led Los Pepes to act as the affidavits report. In short, they do not even hypothesize why Los Pepes would want to kill the defendant, if he did not kill Rosa. In any event, the affidavits do not begin to support the claim that a "public official" has or will acquiesce in Los Pepe's desire to kill the defendant were he returned to Mexico to stand trial for Rosa's murder.

In the final analysis, the argument about Los Pepes is, in reality, not an argument about bond at all. Were the defendant to be granted bond, the question would still be whether he should be extradited in light of the alleged danger from the Los Pepes assailants. But that is not a matter of bond, but of the ultimate legitimacy of extradition. But, as we have seen, the decision about whether someone should be extradited is not for this court. In sum, the Los Pepes argument is an analytical diversion, having nothing to do with the propriety of granting bond to the defendant.

## III.

### BURGOS NOELLER HAS NOT SHOWN THAT "SPECIAL CIRCUMSTANCES" EXIST AND THUS, HE MUST BE DETAINED

As we have seen, the  Bail Reform Act, operative where offenses under the Criminal Code have been charged, 18, U.S.C. 1341, does not apply in extradition proceedings. *In the Matter of the Extradition of Francis Markey*, 2010 WL 610975, at *1 (N.D. Ind. 2010); *United States v. Wroclawski*, 574 F. Supp. 2d 1040, 1044 (D. Ariz. 2008). Rather, bail should be granted in an extradition  proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986), (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (L. Hand, J.)). Only when the defendant has sufficiently shown that "special circumstances" exist, will the presumption against bail in international extradition proceedings be superceded. *United States v. De Loera*, 2006 WL 1518981, at *2 (N.D. Ind. 2016).

In this case, Burgos Noeller has not made the requisite, preliminary showing that he is not a flight risk or a danger to the community. He is, so far as the evidence shows, in this country illegally and there has been sufficient proof from Mexico that he was involved in a ruthless and

murder of the woman who bore his two children. Because the defendant has not shown that he is neither a flight risk nor a danger to the community, the question of bond need not be further addressed. Nonetheless, we shall consider whether the defendant has sufficiently shown whether 'special circumstances" exist warranting his release on bond.

### A.

### The Alleged Special Circumstances In This Case

The pivotal argument in the Motion for Release on Bond is that the defendant suffers from epileptic seizures, has not been provided with proper medical care during his prolonged period of ICE detention, and will not be provided with the appropriate care at the MCC. There is inadequate proof to support the claims. Not only is there no evidence to support the claimed lack of medical treatment for epilepsy while in ICE custody, but the claim in any event is not dispositive since the defendant is now and for the future in the custody of the U.S. Marshals and will be housed at the MCC. It is there that our focus must be directed. "Past is not always prologue." *S & M Brands, Inc. v. State ex rel. Carr*, 253 F. Supp. 3d 1195, 1208 (N.D. Ga. 2017).

We begin with the claim that the defendant underwent cranial surgery in 2014 and that he requires MRIs every six months and that he suffers from recurring epileptic seizures and headaches. The supposed proof consists of a translation of a Report in letter format dated June 6, 2014 from a Dr. Castro, who was apparently a radiologist, to a Dr. Orta regarding the defendant. *See* Ex. A, to Motion for Bond. [Dkt.#13].

The Report as translated does not use the word "epilepsy" or "epileptic." It states that a "hyperintensive lesion is identified on T1 sequence after gadolinium administration is found in the left frontal lobe." It notes there are other "abnormal nodular lesion [sic] from front of 2mm." The

remainder of the translated report is also unintelligible to a layman and requires medical interpretation. The defendant has not bothered to have an expert give an opinion of the terms used in the Report, which does note certain areas of the ventricle and brain stem are "normal" and that the "sella, pituitary well as the orbits and content show no alteration." The Report concludes that the data are compatible with extra-axial neoplasm with left front first possibility in connection with glioma diagnosed with cystic degeneration and right front side tank...." The "differential diagnosis includes metastatic disease to determine origin." Of course, what this all means is not explained by either Dr. Castro, Dr. Orta, or any other doctor with sufficient competency to determine the meaning of the Report.

The defendant has provided no affidavit from anyone confirming epilepsy. Indeed, neither his wife nor his children nor his cellmate, who have given affidavits in this case, make any mention of epilepsy or seizures of any kind, or constant headaches. In sum, the only "proof" of the defendant's medical condition that has been offered is a translation of a report from 2014 that only a doctor can explain. Neither the defendant nor his lawyer have offered anything in that regard. And no family member or relative or acquaintance supported his present claim of epilepsy or seizures or incapacity of any kind despite the fact that they have given lengthy affidavits in this case regarding the defendant.[7]

Significantly, during a recent oral argument, defense counsel conceded in response to my question that the defendant has experienced no recent attacks of epilepsy and no claim was made that

---

[7] In any event, it would seem that an individual concerned about suffering from claimed, spontaneous, life threatening seizures would be likely to receive more immediate care were he in a jail setting than he would were he free on bond without immediate, available medical care or the possible assistance of someone who could immediately call for medical assistance on his behalf.

there were episodes that might have been epilepsy that were unattended to. In fact, the defendant has recently been seen by medical personnel at the MCC upon intake and thereafter. Medicine has been prescribed by a doctor for his knee. Counsel for the defendant also admitted that the defendant has not filed a "grievance" with MCC officials regarding any medical care that he feels he needs but has been denied or that he has been receiving but feels is inadequate, including claims of headaches or epileptic seizures or progressive loss of eyesight.

Given this lack of proof, Burgos Noeller's allegedly untreated, claimed, medical condition is not a "special circumstance" justifying his release on bond. There is nothing in the materials that Burgos Noeller submitted with his motion indicating that he has a unique medical need that cannot or will not be addressed by the staff at the Metropolitan Correction Center.

To avoid incarceration in a case like this, a medical condition must be so serious that "no constitutionally acceptable treatment can be provided" in prison. *In re Extradition of Rouvier*, 839 F. Supp. 537, 541-42 (N.D. Ill. 1993); *In re Extradition of Breyer*, 32 F. Supp. 3d 574, 593 (E.D. Pa. 2014)*; Extradition of Hamilton–Byrne,* 831 F.Supp. 287, 291 (S.D.N.Y.1993)*. Cf. In re Rouvier,* 839 F.Supp. at 542 (serious heart condition not special circumstance that could not be controlled with medication). That is not the case here, and the defendant has offered no proof that what he claims he has cannot be treated in the setting of the MCC.

A provisional arrest, by itself, does not constitute a "special circumstance." *See Molnar*, 182 F. Supp. 2d at 687. When defendant's motion was presented to me, Burgos Noeller's lawyer complained of a lack of attention to his medical needs while he was in ICE custody. No proof was

offered beyond the defendant's unelaborated claim to a Pretrial Services Officer.[8] The defendant's lawyer identified no one and did not ask to take the deposition of anyone who may have had knowledge of or involvement in the alleged lack of care, or to try to find out who was medically responsible for his care while in ICE custody. No affidavit or declaration from the defendant accompanied the motion, although various exhibits were attached, including the declarations of a number of people who expressed their faith in the defendant and their love for him.

Of course, the defendant did not have to present any evidence on his own behalf, and no negative inference is being drawn from the fact that he gave no affidavit to support his claims of medical denial. But he cannot make allegations of impropriety without *proof* and insist that they will be unquestioningly accepted as fact. They will not.

And they are not strengthened by repetition of the lawyer in the case. Indeed, to give a lawyer's statements evidentiary credence and to eliminate the requirement of proof would work a serious deprivation of the rights of the Government and would constitute a  significant abdication of the judicial function. Statements in a brief or at oral argument are not proof or evidence, and they will not be allowed to supplant evidence. *See United States v. Adriatico–Fernandez*, 498 Fed.Appx. 596, 599–600 (7th Cir. 2012); *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc*., 437 F.3d 606, 610–611 (7th Cir. 2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc*., 324 F.3d 492, 494, 497 (7th Cir. 2003).

 Burgos Noeller has been in the custody of the U.S. Marshals for a relatively short time, and the government states it is unaware of any evidence that the medical needs of Burgos Noeller have

---

[8] Any question of the content of the conversation between the defendant and the Pretrial Services Officer was brought up by the defendant, himself.

been neglected by either the Marshals Service or the staff at the MCC and for the government to provide her with an appropriate number so she could make inquiry about the defendant's medical needs and whether they were being seen to. I asked the government to make the same inquiry and to provide if necessary whatever help defense counsel might need. I was assured that would be done. I invited defense counsel to return and tell me if she was not getting cooperation or if information she received demonstrated that her client was not being properly taken care of. Neither she nor the government's lawyer ever returned to tell me that they had adverse information or encountered a lack of cooperation. Nor did they ever do so during the times of our subsequent hearings. In fact, the defendant's lawyer admitted upon questioning that the defendant had seen one or more doctors at the MCC, and that he was receiving a prescribed medication for his eyes.[9]

No claim was made that there was any difficulty with his alleged epilepsy, although she did say that to her knowledge he had been prescribed nothing in that regard. But it bears repeating, that the defense lawyer never brought before me any claim of improper, inappropriate, or substandard medical treatment that the defendant was receiving at the MCC. And my own experience is that prisoners housed at the MCC who, for example, are in need of surgery or specialized care not available at the MCC, are taken to an area hospital or are taken to a specialist – after appropriate scheduling has occurred. In short, The same holds true for inmates who require the outside services of a specialist.

In short, to the extent Burgos Noeller requires the care of a specialist of any kind, those needs can be accommodated by officials as the MCC, as they have been for other prisoners

---

[9] The defendant told the Pretrial Services Officer that he was "losing his eyesight." (Defendant's Reply at 7)[Dkt. #20]. No proof has been offered by the defendant or his lawyer to support the unsworn statement.

in the past. *Nolan*, 2009 WL 4544699, at *3(deterioration of fugitive's health, including skin cancer, did not constitute special circumstance).

## IV.

## POSTSCRIPT

The Motion for Release on Bond [Dkt. #13] states that "*upon information and belief*" the witness against the defendant in Mexico "is a member of the Jacobo Carrillo family which is also a criminal gang operating in Mexico City under the name of Los Pepes." (Emphasis supplied). The defendant's lawyer goes on to assert that this "criminal organization harbors animosity and is biased toward the defendant for having terminated an extramarital relationship he had with one of its members." [Dkt. #13 at 5].[10] This, of course, represents the view of the defendant and his family. The government of Mexico and the witnesses who claimed the defendant murdered Rosa have a very different view of the matter. It is not for this court to disregard the views of Mexico and to prefer the defendant's contrary view of the evidence, because the latter claims it is the truth. If an American court were required to credit the claims of a defendant, there would never be an extradition, and years and years of cases refusing to grant bond in extradition cases would have been decided incorrectly. Perhaps that is why the cases are clear that it is not for the judge in an extradition matter to grant the defendant bond because he insists he is telling the truth and those against him are lying.

## CONCLUSION

The court agrees with the government's arguments at pp. 12-15 of the Response in Opposition to Defendant's Motion for Release on Bond Pending Extradition Proceedings [Dkt. #17]

---

[10] This is not a case where a party is allowed to plead on information and belief, and to the extent the statement was designed to have any significance, it has none. Its inclusion in the brief was pointless.

and with the arguments in its Sur-reply. [Dkt. #27].    The Motion of Defendant for Release on Bond

[Dkt. #13] is denied.


ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE:  12/19/17