# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

IN THE MATTER OF THE            )
EXTRADITION OF                  )    No. 17 CR 664
RODOLFO DEIBY BURGOS            )
NOELLER,                        )    Magistrate Judge Jeffrey Cole
                                )

## MEMORANDUM OPINION AND ORDER

## INTRODUCTION

The government successfully sought the issuance of a Complaint for the Provisional Arrest of Rodolfo Deiby Burgos Noeller (the Defendant) in Furtherance of Extradition pursuant to 18 U.S.C. §3184. [Dkt. #1]. The request was based on the Federal District Court in Mexico City having issued a warrant for the Defendant's arrest on June 18, 2015, charging him with the murder of Rosa Elena Jacobo Carrillo, the woman with whom the defendant admitted having had an affair in Mexico and who, he further admitted, bore him two children.

On October 10, 2017, the United States filed a Complaint for Provisional Arrest in Furtherance of Extradition pursuant to 18 U.S.C §3184. The Complaint alleged that there was an extradition treaty in force between the United States and Mexico, Article 11 of which provides for the provisional arrest and detention of alleged fugitives, pending the submission of a formal request for extradition and supporting documents.[1] The Complaint alleged that in accordance with Article 11 of the Treaty, Mexico has asked the United States for the provisional arrest of the Defendant for having murdered Ms. Carrillo.

The Complaint charged that the murder had been preceded by domestic violence between the Defendant and Ms. Carrillo, and that the Defendant had previously threatened to kill Ms. Carrillo.

---

[1] That request has been made according to the recent submission of the government. [Dkt. #27].

Family members have sworn to Mexican authorities that they saw the Defendant grab Ms. Carrillo by the hair and choke her. He then, they swore, shot her with his pistol twice in the head and fled in a gray Jetta. The family members, who knew the defendant from his lengthy relationship with Ms. Carrillo, identified him as the killer and have agreed to be witnesses at a trial.

On October 12, 2017, the Defendant was transferred from the custody of the Immigration and Customs Enforcement agency to the custody of the United States Marshals. He is presently housed at the Metropolitan Correctional Center in Chicago. Despite the nature of the charged crime and the existence of sworn statements from those who have said they were eye witnesses to the murder, the defendant sought release on bond. [Dkt. #13]. That request was denied. *See In the Matter of the Extradition of Rodolfo Deiby Burgos Noeller*, 2017 WL 6462358 (N.D.Ill. 2017). [Dkt. #22]. That denial was followed some weeks later by an extradition hearing to determine whether the Defendant should be extradited to Mexico.

After the defendant testified over the government's relevancy objection that he was innocent – although he conceded he had two children with the murder victim – and after he was allowed over the government's objection to make an offer of proof which included letters and affidavits from friends and family members, I concluded that the sought-after extradition should be granted, and that the arguments advanced by the defense could not bar the extradition of the Defendant. I also concluded that the Defendant's arguments contravened the basic and irrecusable principle that an extradition hearing is not a trial on the merits nor is it the time to contest the truthfulness of the proof offered by the requesting country.

I also concluded that the Defendant's additional claim that if extradition were granted he would likely be killed – apparently with the connivance of one or more officials of Mexico – was

a request for humanitarian intervention that should be made to the State Department and that was outside the scope of a court's extradition authority.

## FACTUAL BACKGROUND

### A.

In support of the request for extradition, the United States submitted a comprehensive Memorandum of Law. [Dkt. #33]. Attached to it, in Spanish, with an English translation, are a detailed compendium of materials, supported by 14 exhibits. [*See* Attachments 1 and 2 to Dkt. #33]. Attachment #1 is from Tom Heineman, an Assistant Legal Advisor in the office of the Legal Advisor for the Department of State, Washington, D.C., which has responsibility for extradition request. He states that there is an extradition treaty in full force and effect between the United States and Mexico, and that the extradition of the Defendant was formally requested on December 7, 2017. The offense charged against the defendant is covered by Article 2 of the Treaty. *See* Attachment 1.

Attachment 2 is signed by Roberta Jacobson, Ambassador to Mexico. It is dated in November 2017 and is an Attachment to the government's Memorandum in Support of Extradition. It is supported by an 18-page affidavit from Mr. Toroba, a citizen of Mexico who has been a Federal Public Prosecutor since 2004. It is stated that there exists an arrest warrant for the Defendant who has probable responsibility for the crime of Aggravated Homicide. He asserts that the Defendant is "a fugitive of the Mexican justice" and that the government of Mexico is seeking international extradition so that the Defendant may be tried for the crime with which he has been accused.

The extended and detailed statement goes on to describe the public prosecutor's duty and the steps that are to be taken once the authorities have knowledge of the probable existence of a crime. There then follows an extensive summary of the criminal case filed against the defendant and how

the affiant has analyzed all the documents comprising the criminal procedure and the proceedings thus far carried out. The sworn statement states that in case No. 99/2015, the defendant is charged with having killed Ms. Carrillo at Calle Lago Nicaragua, in Mexico City on January 30, 2015. It gives the "relevant facts of criminal case 99/2015." According to the sworn statement of the federal prosecutor, the defendant began to argue with Ms. Carrillo at her residence in Mexico City, grabbed her by the hair, and then took out a gun with which he shot her twice in the head. He then, according to the sworn statement, she fled in a Volkswagen Jetta with license plates MKA-5172.

The victim's niece, Jenifer Danai Gonzalez Jacobo, swore that her aunt, Ms. Carrillo, had received several calls from the Defendant. When she finally replied, the Defendant told her "mother fucker, if you are seeing someone else, I'm going to kill you." The victim said that she was with her niece and the Defendant said "mother fucker, that little shit, daughter of a whore, I am also going to kill her. I am pissed." (Ex. 5). They ultimately went to the grandmother's house. Later that evening, the Defendant asked her if Ms. Carrillo was seeing someone else and if she had agreed to go to a dance. He was told that that wasn't so. She then described how she saw the Defendant kill her aunt and flee in a grey Jetta. (Ex. 5 to Attachment 2 to Dkt. #33).

The sworn statement of Mr. Teroba, the federal prosecutor, recounts statements by the victim's sister, who is quoted as saying that Ms. Carrillo frequently had problems with the Defendant, "who used to beat her and even dared to threaten her death." Some 20 minutes after the defendant arrived at the victim's home, Ms. Carrillo said she heard two shots and immediately came out of the house, saw her sister bleeding on the ground, and saw that the Defendant "was getting into

a car to flee." Ms. Carrillo was taken by ambulance to the hospital where she was pronounced dead.[2]

Alejandra Jacobo Carrillo, the sister of the decedent, swore under oath that she has known the Defendant for 20 years. She had first met him when he was her neighbor. She said that she recognized the Defendant from a photo array that was shown to her. (Ex. 13). She said under oath that the Defendant started to strangle her sister and then took out a gun and shot her twice in the head. She said that she saw the murder and that "there is no doubt in [her] mind" that the killer was the Defendant.(Ex. 13).

Exhibit 14 were four pictures of the Defendant.[3]

The sworn statements of the witnesses to the killing, in addition to being summarized by the Assistant to the Public Prosecutor, are attached in English and Spanish as Exhibits 5, 7 and 13 to the government's submission. *See* Attachment 2, Exhibits 4 and 5 to Dkt. #33. The scientific reports, prepared by Mexican forensic experts regarding the death from two gunshot wounds to the head are to be found in Exhibits 6, 8-12. *See* Attachment 2 to Dkt. #33.

In short, only literary perversity or jaundiced partisanship could suggest that *if* the above evidence is true, probable cause does not exist that the Defendant is guilty of murder – or, as it is referred to in Attachment 2 to Dkt. 33, "aggravated murder." This is not to say that the witnesses are telling the truth about the killing. The question of guilt or innocence is not for this court in an extradition proceeding. *California v. Superior Court of California, San Bernardino County*, 482 U.S.

---

[2] It may be parenthetically noted that even if the prosecutor were only quoting what the witnesses had said, extradition would not thereby be improper. *See In the Matter of the Extradition of Roman Zygmont Jarosz*, 800 F.Supp.2d 935 (N.D.Ill. 2011) and cases cited.

[3] The statements of the witnesses in Spanish were also attached. Among the Exhibits both in Spanish and English were forensic reports pertaining to the death of the decedent. *See* Exs. 6, 8-12.

400 (1987); *Neely v. Henkel,* 180 U.S. 109, 123 (1901); *Mainero v. Greg*, 164 F.3d 1199, 1207 (9th Cir. 1999); *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). Determinations of credibility are not to be made except at trial, which cannot occur at an extradition hearing under the uniform holdings of all the courts. *Neely*, 180 U.S. at 123; *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)(Holmes, J.); *Matter of Extradition of Fordham*, 2017 WL 6329558, at *9 (D. Alaska 2017); *Matter of Extradition of Correa*, 2017 WL 6492089, at *3 (S.D. Fla. 2017); *In the Matter of Grynsztein*, 2015 WL 6039845, at *3 (S.D. Fla. 2015).

**B.**

Over the government's objection, the Defendant made an offer of proof, the essence of which was that he was not the killer. The offer consisted of the Defendant's actual testimony, and letters and affidavits from friends and family, the thrust of which was that the Defendant was a fine and decent man who could not be guilty and which spoke in varying ways of the terrible retribution that he would face if he were extradited. Not surprisingly, given the unanimous holdings of the federal courts that an extradition hearing cannot be a trial of guilt or innocence, the government moved *in limine* before the hearing began to exclude the Defendant's proposed "evidence," which it characterized as "irrelevant." [Dkt. #36].

While the title of the government's motion said that it was brought to "exclude irrelevant witness testimony," the motion also said that its granting was necessary to prevent confusion of the issues and the prevention of "undue delay and waste of judicial time. [Dkt. 36]. While granting the motion *in this case* would have properly eliminated evidence of claimed innocence, it would not have prevented confusion of issues, which is a consideration in jury trials. However, a number of courts have held that motions *in limine* are generally ill advised in the context of a bench trial. *See,*

6

*e.g., Shaw v. Citimortgage, Inc.*, 2016 WL 1659973, *3 (D.Nev. 2016). This hesitancy seems especially pronounced when, as here, a purported "expert" is involved.[4] *In re Polo Builders, Inc.*, 388 B.R. 338, 369 (N.D.Ill. 2008).

However, the view that motions *in limine* are inappropriate in bench trials is far from universal. *See, e.g., Sellers Capital, LLC v. Wight*, 2017 WL 3037802, n. 1 (N.D.Ill. 2017); *Estate of Rick v. Stevens*, 2002 WL 1713301, at *2 (N.D. Iowa 2002). While protecting the jury from the potentially harmful effects of inadmissible testimony is a goal inapplicable in bench trials, motions *in limine* can perform other vital functions even where a jury is not involved. The husbanding of necessarily limited judicial resources is a valid concern. Indeed, the Seventh Circuit has repeatedly held that each hour spent on a dispute that could be profitably have been spent on a case in which resolution of the issues could only come from the court is an hour wasted. *See Chicago Observer, Inc. v. City of Chicago,* 929 F.2d 325, 329 (7th Cir.1991). Since the government's motion *in limine* was based, in part, on an inappropriate concern (i.e., claimed confusion of the relevant issues), the motion was denied. It seemed to me then – and events have confirmed the accuracy of that assessment – that allowing the defendant to put on his announced evidence either through testimony or an offer of proof should not be taken as an indication that the evidence was relevant or that granting of the motion would result in an appreciable savings of judicial time. In fact, the presentation of evidence, coupled with argument by counsel, only lasted some four hours.

---

[4] The Defendant had said that he had an "expert" who would testify, in effect, that if the Defendant were extradited to Mexico City, it was likely under the circumstances of this case that he would be killed, with the involvement of one or more government officials. As we shall see, that testimony is not only baseless but if true, would present a consideration for the State Department, not a court, to consider

In short, the denial of the government's motion should not be deemed as an indication that the government was wrong and that the "evidence" put on by the defendant was relevant to an extradition case. It was not.

## C.

The main theme of the Defendant's presentation was that there was a very strong possibility – if not a certainty – that he would be killed if he were to be extradited to Mexico. The "proof" consisted of a newspaper article about a gang called Los Pepes, which is reputed to operate throughout Mexico, although its activities are a good deal stronger in some place than others. (Ex. 3). There were also menacing pictures of people with guns, apparently taken off the internet (Ex. 4) and related information about them. (Ex. 5). Exhibit 2 was almost entirely in Spanish. Exhibit 6 was in Spanish, and its relevance was anything but apparent.

Defense Exhibit 7 was a single spaced, 23-page document, titled "Expert Witness Report" prepared by Nathan P. Jones, Ph.D. It was accompanied by a 6-page, single spaced list of "references which compiled apparently materials either that Dr. Jones had read or relied on, it was never clear. Finally, accompanying all this was a 13-page, single spaced Curriculum Vitae. The government's objection that the report, like the balance of the "evidence" offered by the defense was irrelevant and inadmissible. I ruled that Dr. Jones testimony would constitute an offer of proof over the objection that his testimony was irrelevant – which I ultimately found. Dr. Jones, had never been an expert in a federal court. He said that he was never asked.

Dr. Jones conceded that he could not conclude with any certainty that if extradition were granted the Defendant would be harmed or killed if returned to Mexico. He conceded he conducted no investigation and his testimony was highly speculative. He also conceded that motivation was not

a basis for expert testimony but that it was his opinion that most cases in Mexico are rigged if they involve organized crime, and his conclusion was not merely linked to situations involving Los Pepes.

It was obvious that his opinion was based upon an acceptance of what he had been told about this case and what the defense witnesses had claimed. In fact, he readily conceded that if people were not telling the truth, his evaluation would be different. But he went so far as to say that even if the Defendant had killed Ms. Carrillo, he believed the Defendant wouldn't get a fair trial in Mexico. In fact, he concluded that even if the Defendant were innocent, he wouldn't get a fair trial. He summed it all up by saying guilt or innocence was irrelevant to his conclusion that the Defendant would be killed if he was returned to Mexico.

He had no independent judgment of the honesty of the representations that had been made by the defendant's family and friends here and in Mexico regarding the involvement of Los Pepes in this matter. Nor could he. Indeed nor could this court, which could see or hear the witnesses. It was obvious that his judgment was based upon his belief that Los Pepes was actually involved in this case and that it was a matter in which they had substantial interest. All of this, of course, ultimately depended on acceptance of the claims made by the necessarily interested defense witnesses that Los Pepes had involvement in this case and were highly motivated to kill the Defendant.

But these individuals had never been subject to cross-examination, the "'greatest legal engine ever invented for the discovery of truth.'" *Lilly v. Virginia*, 527 U.S. 116, 124 (1999); *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1048-49 (7th Cir. 2003). Nor had a judge (or Dr. Jones, for that matter) had any opportunity to be exposed to their demeanor, which while not conclusive, counts when one is trying to assess the truth. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (U.S. 1985); *United States v. Quinones*, 511 F.3d 289, 297 (2nd Cir. 2007). Yet, Dr. Jones opted

9

uncritically for the defense version of events and refused in the end to countenance a version of events that might undercut his theory. It is partly because a judge in an extradition hearing cannot judicially determine the truthfulness of the kinds of claims Dr. Jones so cavalierly assumed to be true that the doctrine rightly emerged that it is the State Department, not the judiciary with the limited tools at its disposal, that must make the delicate, ultimately humanitarian determination whether there are genuine and sufficient risks of death or torture that extradition should not be allowed.

The Defendant also submitted as Exhibit 8 a statement under oath of Juan Ruben Luna Carrillo, who stated that her aunt, Ms. Jimenez, has "mentioned on various occasions" that she will get people to harm the defendant "since she blames him for the homicide of C. Rosa Loreno Jacobo Carrillom [sic] who is the decedent in this case. No further details were given in the sworn statement. She said that her aunt had told her that upon the Defendant's return "she will set a price for someone to threaten his life and/or physical integrity." She insists that this testimony is true because, after all she said, is under oath to tell the truth. She concludes by saying, without any explanation, that Ms. Jimenez "has direct contact with weapons dealers, which is why she has possession of caliber fire arms in her home" and has contact with persons of notoriety (criminals) who are capable of achieving the types of "maneuvers" directly or through associated criminals.

Defendant's Exhibit 9 is a translation of a statement from Frederico Noeller Castillo, the cousin of the defendant. The unsworn letter states that "these people are bad because they shot at my mom's home when she was inside the home and is very ill" because of her blood pressure and high blood sugar. There is a reference to unspecified "people" who dedicate their time to rob and hitting people – facts of which he has learned via television and newspapers. (It is because newspapers are

10

insufficiently reliable that in this County they are not an exception to the hearsay rule. *See* cases cited in *O'Sullivan v. City of Chicago*, 2007 WL 671040, 12 (N.D.Ill. 2007)). )He also states that he "knows" these people have family that work for the police department and act as they do because they are aware they can get away with it – even if they shoot, rob, and beat on people in broad daylight. These people, he says, are called "The Pepes."

The Defendant also offered an unsworn letter from his father, stating that if his son were to be extradited "his life will be at risk" because in Mexico people who want him are "evil and powerful" and have contacts to harm him both in and out of jail. He assures me that his parents, siblings, and sister-in-law had to leave their homes for fear of losing their lives. I am also told that the Defendant, his son, is an effective entrepreneur, a responsible man, and a good provider to his family. Indeed, I am told he helps everyone in his family and in the neighborhood. He is not, says his father "capable of hurting anyone." His letter concludes with a request that I give him "political asylum" – and that he not be extradited. (Ex. 9).

The cousin of the Defendant also wrote that the Defendant cares greatly about his family. Similar character letters were also included from family members. (Ex. 9). Indeed, his brother has written insisting that the Defendant's only mistake was in having supported someone – presumably the victim – "whose family belongs to a very bad gang who has always been dedicated to harming people to committing illicit acts such as drug sales, robberies, homicides, kidnappings, etc. Indeed, he says, that since he was a boy "they have terrorized people."

The defense also stated as part of its offer of proof that Tammy Moreno, the wife of the Defendant, would testify regarding the issues presented by the defense and that she would say that the Defendant could not have committed the murder since he was with her – a fact claimed by the

11

Defendant, himself, in his testimony/offer of proof.[5]

Finally, there is the affidavit from the Defendant's father-in-law, and the father of the Defendant's wife, Tammy Moreno, Vincente J. Moreno. He states that he was told by a neighbor in Mexico that a vehicle arrived at his home looking for Deiby Burgo's father-in-law. The "gangsters" surrounded my vehicle in Mexico and "opened fire," the bullets breaking the windows and penetrating the body of the vehicle, according to his affidavit. The affiant was informed by the neighbor that one of the shooters shouted that the shots were a warning and a beginning of what would happen to whomever hid the Defendant. The neighbor contacted Mr. Moreno and told him what had occurred and sent pictures. The neighbor recommended that the affiant not return to Mexico because he believes the Pepes would have killed me. (Ex. 11).

We turn to an analysis of the nature of extradition proceedings.

# I.
# THE FRAMEWORK OF EXTRADITION PROCEEDINGS

The extradition process is *sui generis*. *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011). Extradition is primarily an executive function, with the court playing a defined and limited role. Authorized by statute, the court is to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184. The Secretary of State, and not the court, ultimately decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Eain,* 641 F.2d at 508. "This bifurcated procedure reflects the fact that extradition proceedings contain legal

---

[5] Under the materials submitted by the defense is a list of witnesses, the second of whom is Ms. Moreno. *See* Ex. 2 to the Defendant's Memorandum of Law Opposing Extradition. [Dkt. #34]. But there is no affidavit or letter from her among the 11 defense exhibits provided by the defense. [Dkt. #34].

12

issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. If the court finds that they have been, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"). *See also Eain*, 641 F.2d at 508.

In fulfilling its function under §3184, the court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933). *See also, Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016)(*en banc*)("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfilling our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), a court should "approach challenges to extradition with a view toward finding the offenses within the treaty." *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981). *See also United States v. Nolan*, 2009 WL 4544699 at 2-3 (N.D.Ill.

2009)("'...the rational [sic] for not ordinarily granting bail in extradition cases is that extradition cases involve an overriding national interest in complying with treaty obligations.'").

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the court. 18 U.S.C. §§ 3184 & 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005)(extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn v. Robinson*, 783 F.2d 776, 789 (9th Cir. 1986) ("the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive"). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *In re Kaine*, 55 U.S. 103, 110 (1852).

## II.

**THE LIMITATIONS APPLICABLE TO EXTRADITION HEARINGS AND THE STANDARD OF PROBABLE CAUSE**

It cannot be too often repeated that the core limitation applicable in extradition hearings in federal court is that an extradition proceeding is not a trial. Questions of credibility and guilt or

innocence are not to be considered. These limitations have been recognized by every court in every extradition case since the beginning of the Republic. *See* cases cited at 5-6, *supra*. Rather, an extradition proceeding is similar to a preliminary hearing. *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *David v. Att'y Gen. of United States,* 699 F.2d 411, 415 (7th Cir. 1983), *cert. denied,* 464 U.S. 832 (1983). An accused in an extradition hearing has no right to contradict the demanding country's proof or to rely on questions of credibility as in an ordinary trial. *Eain*, 641 F.2d at 511. Evidence of alibi or of facts contradicting the demanding country's proof or of a defense are to be excluded from the hearing. *See Santos v. Thomas*, 830 F.3d 987, 992–93 (9th Cir. 2016); *Kapoor v. Dunne*, 606 F. App'x 11, 12 (2nd Cir. 2015); *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2nd Cir.1973). To do otherwise would convert the extradition hearing into a full-scale trial, which, it bears repeating, it is not. *Kapoor v. Dunne*, 606 F. App'x 11, 13 (2nd Cir. 2015)*; Jhirad v. Ferrandina,* 536 F.2d 478, 484 (2nd Cir.1976).

The Act leaves only four issues open for consideration before the fugitive is delivered up: (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive. Thus, as has been said time and again, an extradition hearing must not allow to become a trial on the merits. *California v. Superior Court of California, San Bernardino Cty.*, 482 U.S. 400, 401 (1987); *Eain*, 641 F.2d at 511; *Garza v. United States*, 180 F. App'x 522, 523 (5th Cir. 2006); *Quinn*, 783 F.2d at 815; *In re Solis*, 402 F. Supp. 2d 1128, 1132 (C.D. Cal. 2005); *In re Extradition of Santos*, 795 F. Supp. 2d 966, 988–89 (C.D. Cal. 2011).

Essentially, the standard to be employed is that of probable cause, namely whether there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. A vast difference exists between the amount of proof required to sustain a conviction and the amount of proof necessary to support probable cause. *Cf. Brinegar v. United States*, 338 U.S. 160, 172–73 (1949). "Probable cause... does not require evidence sufficient to support a conviction." *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 679 (7th Cir.2007). This is precisely the point made by Justice Holmes in *Fernandez v. Phillips*. In making a probable cause determination, courts "make a practical, common sense decision whether, given all the circumstances ... there is a fair probability that the defendant committed the crime." *In re Extradition of Okeke*, 1996 WL 622213, *5 (D.N.J.1996); *Eain*, 641 F.2d at 511 ("An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility, as in an ordinary trial, but only to offer evidence which explains or clarifies that proof.").

"In practice, this means that an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government's proof, or call into question the credibility of witnesses...." *Luna v. O'Keefe*, 2018 WL 784783, at *7 (N.D. Cal.2018). *See also Lindstrom v. Gilkey*, 1999 WL 342320, *5 (N.D.Ill.1999). *DeSilva v. DiLeonardi,* 125 F.3d 1110, 1112 (7th Cir. 1997)*; Bovio*, 989 F.2d at 259; *Sahagian v. United States*, 864 F.2d 509, 514 (7th Cir.1988); *Eain,* 641 F.2d at 511. *See also Mainero v. Gregg*, 164 F.3d 1199, 1207 (9th Cir.1999) ("Generally, evidence that ...merely controverts the existence of probable cause, or raises a defense is not admissible."). Such evidence obviously and impermissibly conflicts with the evidence submitted on behalf of the demanding state. *Collins v. Loisel,* 259 U.S. 309, 315-17 (1922). Nor may evidence be received on behalf of the Defendant that raises an alibi defense, *Shapiro v. Ferrandina*, 478 F.2d

894, 901 (2nd Cir.1973), or suggests an affirmative defense. *Charlton v. Kelly,* 229 U.S. 447, 462 (1913). *See also Eain*, 641 F.2d at 511; *Luna, v. O'Keefe*, 2018 WL 784783, at *7 (N.D. Cal.2018).

These and related issues are exclusively for the court in the requesting country to resolve in accord with its own procedures. Yet, the Defendant's offer of proof in this case plainly contested the evidence submitted by Mexico and sought to establish innocence and an alibi. This consistent case law will not allow.

## II.

## HUMANITARIANISM AND CLAIMS OF FUTURE TORTURE

To his claim of innocence, the defendant had added a variation: even if he otherwise qualifies for extradition, he ought not be extradited because, he claims, that if he is returned to Mexico he faces the risk of torture or death. This sort of claim is made by more and more defendants given the constraints imposed on the inability of a defendant to contest an otherwise proper demand for extradition. *See, e.g., Perez -Montes v. Sessions*, _F.3d_, 2018 WL 525489 (7th Cir. 2018); *Godinez-Godinez v. Sessions*, _Fed.Appx._, 2018 WL 480490 (6th Cir. 2018); *Perez v. Mims*, 2016 WL 3254036, at *4 (E.D. Cal. 2016). To this is often added the claim that foreign gangs focus on family members. That claim has fared no better, *In re Solis.*, 402 F.Supp. 2d 1128, 1132 (C.D. Cal2005), and courts have recognized that merely saying so does not make it so. *See e.g.*, *Morales-Sucuc de Garcia v. Sessions*, 707 Fed.Appx. 237 (5th Cir. 2017); *Moreno v. Sessions*, 694 Fed. Appx. 391 (6th Cir. 2017); *Marroquin-Rivera v. Sessions*, 861 F.3d 7 (1st Cir. 2017); *Mendez v. Attorney Gen. of United States*, 684 F. App'x 231, 233 (3d Cir. 2017).

These arguments have been held to invoke "humanitarian" considerations which are within the *exclusive* purview of the executive branch and cannot and should not be addressed by the courts in

17

deciding whether a petitioner is extraditable. *See, e.g., Patterson v. Wagner*, 785 F.3d 1277, 1281 (9th Cir. 2015); *Sidali v. I.N.S.*, 107 F.3d 191, 195 n. 7 (3rd Cir. 1997)("[W]e note that it is the function of the Secretary of State—not the courts—to determine whether extradition should be denied on humanitarian grounds."); *United States v. Kin–Hong*, 110 F.3d 103, 110 (1st Cir.1997) ("Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country.")( internal quotation marks and citation omitted). The principle of non-inquiry serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request. *See Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2nd Cir.1990); *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir.2005); *Matter of Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *2 (N.D. Ill. 2017).

Once an individual is certified by a court as extraditable, the Secretary of State "exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations" in deciding whether extradition is appropriate. *Sidali,* 107 F.3d at 195 n. 7; *see also Kin–Hong*, 110 F.3d at 109–110 (noting that "[t]he Secretary may ... decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations," and "may also elect to use diplomatic methods to obtain fair treatment for the relator"). Under the principle of non-inquiry, and in view of the evidence before it, I find that the request for extradition of the Defendant should be and is granted. *Hoxha v. Levi*, 465 F.3d 554, 563–64 (3rd Cir. 2006).

The government's request for extradition is granted.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

DATE: 2/23/18